Randal J. **LAVERGNE**

v.

**CHEVRON U.S.A., INC., et al.**

Civ. A. No. 88–3092–LC.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Sept. 13, 1991.

**1164**

Roger G. Burgess, Baggett, McCall & Burgess, Lake Charles, La., for plaintiff.

Randall K. Theunissen, Allen & Gooch, Lafayette, La., Lloyd C. Melancon, Stephen C. Carleton, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for Chevron U.S.A., Inc.

Robert W. Clements, Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, La., for M/V Christopher, Inc. and Gulf Crews, Inc.

Walter Marshall Sanchez, Lorenzi & Sanchez, Lake Charles, La., for Gray Ins. Co.

## RULING

JAMES T. TRIMBLE, Jr., United States Magistrate Judge.

This matter came on for trial before the undersigned on the 6th day of June, 1991, the plaintiff seeking damages for an injury sustained by him on November 18, 1987, while transferring from a fixed platform onto a vessel located in the Gulf of Mexico. Plaintiff claims that defendant Chevron U.S.A., Inc. was negligent in ordering him to swing from the platform to the vessel in rough weather conditions. Plaintiff further claims that defendants Gulf Crews, Inc. (the employer of the crew of the M/V Christopher) and M/V Christopher, Inc. (the owner of the vessel) were negligent in allowing plaintiff to attempt to transfer to the vessel in rough weather conditions. Chevron U.S.A., Inc. filed a cross-claim against M/V Christopher, Inc. and a third-party complaint against the M/V Christopher *in rem* and her various insurers, claiming it is owed defense and indemnification, including attorney's fees and all costs in connection with its defense of the instant matter, pursuant to the terms of a time charter agreement between Chevron and M/V Christopher, Inc., and further by virtue of certain policies of insurance issued in favor of Chevron. An Intervention was filed on behalf of Gray Insurance Company as the insurer of plaintiff's employer, Crown Oilfield Services, Inc., seeking recovery of compensation and medical benefits paid to or on behalf of the plaintiff pursuant to the Longshore & Harbor Workers' Compensation Act.

## *Summary of the Evidence*

Evidence adduced at the trial of this case established that the plaintiff, on November 18, 1987, was a 27 year old roustabout employee of Crown Oilfield Services, Inc. (Crown). He was employed on Chevron's fixed platform identified as Vermilion 287 situated about 100 miles offshore in the Gulf of Mexico. Crown was under contract with Chevron to supply roustabout services to that platform. Plaintiff testified that he had been assigned to this platform for three years before his accident. At one time, other Crown employees had been employed on that rig, but he was the only Crown employee left after the oil crunch. He characterized himself as a good worker who got along well with everyone. He stated that he took orders directly from Chevron personnel, who told him how, when, and where to work. He worked sometimes on the Vermilion 287, but he also worked at Chevron satellite rigs at times. Although he was a direct employee of Crown, he had been told that he had a chance of becoming a direct employee of Chevron. This he wanted to do because the pay and benefits were better with Chevron.

The M/V Christopher, Inc., which owned and operated the M/V Christopher, had contracted with Chevron to provide vessel services to Vermilion 287, and Gulf Crews, Inc. was the direct employer of the Christopher crew. Chevron was named as an additional assured in the liability (P & I) policies issued to MV/Christopher, Inc.

The MV/Christopher was described by Captain Paul Wilson as a "Cadillac" class

utility vessel, 130 feet long, with a 30 foot beam and 10½ foot draw. The boat had a landing area 3½ to 4 feet wide across the width of the rear constructed of open steel grating. There were handrails about 3 feet in height forward of the width of the landing area with about a 3 to 4 foot break in the middle for ingress and egress. The landing area was utilized by persons using a swing rope to transfer from platforms or rigs to the vessel.

On November 18, 1987, the Christopher arrived at 287 in the afternoon with a load of groceries and supplies. According to Captain Bennett J. Hardy, the other Christopher captain at the time of the accident, there was some discussion between the boat and the rig, with the boat advising the rig that the water was a little rough or choppy. The rig advised that it needed the groceries and the boat said they would make an attempt to off-load the supplies. There was no testimony identifying who spoke for the boat and who spoke for the rig. Captain Wilson did not deny such a conversation, but testified that he could not recall it.

At any rate, both Captains Wilson and Hardy testified that they were well-acquainted with the plaintiff's ability as a roustabout. They delivered supplies to the rig about once a week, and Mr. Lavergne routinely would swing onto the boat, using a rope attached to the platform for that purpose, would hook up the supplies to be lifted from the boat deck by the crane on the platform, and would then swing back to the platform on the same rope. Both of the boat captains considered Lavergne an experienced and highly qualified roustabout. In fact, Captain Wilson testified that "Killer" (plaintiff's nickname) was the "best roustabout they had out there." He had never seen the plaintiff experience any problem swinging on board the vessel and considered the plaintiff to be very agile.

There is some divergence in the descriptions of the sea conditions at the time of the plaintiff's accident, which occurred at about 4:00 P.M. Plaintiff estimates wind velocity at 30–35 miles per hour and seas at 8–10 feet. Captain Hardy estimates wind velocity at 25–30 miles per hour, with seas between 5 feet and 8 feet. Captain Wilson estimates 4–6 foot seas, and the same estimate is supplied by Mervin Lee Corbello, Jr., the deckhand who assisted the plaintiff in boarding the vessel. Finally, Rebecca Bourgeois, who worked for Chevron as a gauger on Rig 287, estimated winds at 25 miles per hour and 5 foot seas. She had observed the surface of the water from the crane deck, about 85 feet above, so her vantage point was less favorable than that of the other witnesses.

Plaintiff testified that he was told by Chevron employees to off-load the Christopher when it arrived at the platform. He went down from the gauger shack, where he was when the call about the boat came in, to the 10 + catwalk, picking up his floatation device on the way. It took him about 5 minutes to descend the catwalk. The spray was splashing upon his pants on the catwalk, which was generally felt to be some 10 feet above the water surface. This distance, however, would vary with tides, and no one provided any information to indicate what the distance between the catwalk and the still surface of the Gulf would have been at the time of the accident. Mr. Lavergne testified that it took the deckhand, Corbello, about 10 to 15 minutes, using a 15 foot gaff, to catch the swing rope which was being blown by the wind at a sharp angle from the vertical, and to push the rope to the plaintiff on the catwalk. Mr. Lavergne then was aware that he had to time his swing with a portion of the boat so that he would swing out when the landing platform at the rear was momentarily relatively stationary at the crest of a wave. He testified on direct examination that no one had given him any training in how to use the swing rope or how to time the waves. On cross-examination, however, he stated he knew how to use a swing rope and he did not need anyone to show him how to do it. The swing rope that he utilized had knots in it which Mr. Lavergne estimated to be approximately a foot apart. He stated that he had never swung onto a vessel in seas this rough before, but he had boarded on a swing rope in 4 to 6 foot seas. This was a

maneuver which he had accomplished many times while working on the Chevron rigs, both the 287 and Chevron satellite rigs.

Mr. Lavergne testified that the boat was positioned about 10 to 15 feet out from the platform when he swung. On cross-examination, he admitted having stated it was about 10 feet away when his pretrial deposition was taken. It is noted that the deckhand, Corbello, who was standing right across from Mr. Lavergne, estimated it was only a 3 to 4 foot horizontal swing. Captain Wilson estimated the distance at between 3 and 5 feet, and further testified that a man would be a fool to try to swing across a 10 to 15 foot expanse of water under the prevailing conditions. On cross-examination, Mr. Lavergne testified that he neither ran nor pushed off from the platform in order to cover the distance between the catwalk and the vessel, and the undersigned cannot picture how he would negotiate a 10 to 15 foot distance on a rope by doing neither.

At any rate, Mr. Lavergne testified that as he swung across to the boat, with his right hand above his left hand on the rope, the boat came into a ground swell and his right forearm and left hand struck the vertical rail on the landing area, causing him to turn around so that he was facing the platform, and rather than swing back out over the water, he dropped a distance of about 3 feet to the landing area on the vessel. There was a deckhand there to help him and keep him from falling into the water. On cross-examination, it is noted that plaintiff admitted he had testified on deposition in June of 1989 that he could not remember his finger or his hand hitting the handrail. Plaintiff states that he was immediately aware that his left middle finger was seriously injured and in fact broken. Plaintiff went on to testify that he underwent some seven surgical procedures on his finger, his total length of treatment and incapacity extending over many months. He did reach maximum medical cure, however, and did not claim to be disabled as of the time of trial as a result of the finger injury. Mr. Lavergne also testified that he was 6'-3" tall and weighed between 200 and 210 pounds.

Captain Hardy stated that he saw the deckhand retrieve the rope for Mr. Lavergne and watched Mr. Lavergne swing over to the boat. His testimony was that Randy mistimed his swing, or "missed the boat", and pushed off from the boat back toward the platform and then swung back a second time to the boat, and it was on this second swing that he hit the rail, spun around, and dropped on the deck. Captain Hardy said that Randy told him he had broken his finger on the swing rope coming down, but this was after he had hit the rail with his forearm and spun around.

Captain Wilson stated that he saw the plaintiff swing onto the boat, drop a distance of about 2 feet to the landing area, and then drop to his knees then get up swinging his hand. He was not too certain about the exact words but Randy said something to the effect that he had broken his finger coming down the swing rope. When he got up from his knees, he had an anguished expression on his face.

It is further noted that Mr. Lavergne testified that he had no criticism of the manner in which the vessel was operated or the manner in which the crew performed its duties. He also had no criticism of the swing rope which he used, and he testified that he used the same swing rope a short time after the accident in getting back from the vessel to the platform. He further stated that he had some concern about his job security if he had refused to swing onto the boat because of the high seas, but he also testified that he was not afraid of Becky Bourgeois, one of his supervisors. He admitted that he was in a better position than Becky to observe how dangerous the seas were, as she was up above and he was down at the surface of the water. He did nothing to try to communicate the sea conditions to the Chevron people above, and he testified also that he did not think anyone with Chevron would send him to do a hazardous activity if they knew it was hazardous. On cross-examination, Mr. Lavergne admitted that at his deposition in 1989, he had testified that he did not know how the injury to his finger had happened.

Rebecca Bourgeois is 5'2" tall and weighs 147 pounds. She uses the same swing rope getting from the platform to vessels and from vessels to the platform that was used by Mr. Lavergne. She can recall at least one occasion where she has boarded a vessel from the platform in 8 foot seas, and she had no difficulty. She testified that Tammy Bourque, who operated the crane, had received the call about the boat and simply stated that the boat was there. She said that Randy was not instructed to go down to off-load the boat, but simply knew what he was supposed to do and started down to the catwalk. Randy never reported back with any problems with the sea or wind, but if he had reported the situation was dangerous he would not have been required to swing onto the boat. In swinging onto boats from platforms, one has to have good judgment and proper timing. Ms. Bourgeois stated that it was seldom "slick calm", but there were usually some waves and that you learn to swing out when the boat is at the top of a swell.

Mervin Lee Corbello, Jr., the deckhand, testified that he was standing on the landing area at the rear of the vessel and that he caught Mr. Lavergne when he swung over from the platform, a distance of only 3 to 4 feet. He stated that nothing untoward occurred during the transfer, but that he caught the plaintiff when he swung over and that Lavergne simply dropped 1½ to 2 feet down to the deck. When he landed, Lavergne told him he had hurt his finger. Mr. Corbello, for the past 3½ years has been working as a truck driver, and is not associated with any of the parties at the present time. He had no recollection of Mr. Lavergne swinging over and then swinging back, as testified to by Captain Hardy, and of course Mr. Lavergne himself did not describe any such occurrence.

Two experts testified in this case. Plaintiff called Mr. Charles E. Singletary who had worked in oil fields for some 42 years. He began as a roughneck and worked his way up to the position of Vice-president of Operations for Temple Drilling Company. He had some 17 years experience in offshore loading and off-loading; he worked in the Gulf of Mexico from 1978 to 1988.

He holds no membership in any professional organizations, and the last time he was on a production platform was in 1987 or 1988. He is not an engineer. He had previously been recognized as an expert in "general oilfield practices", but in light of his experience, the court permitted him to testify as an expert in loading and off-loading boats in the Gulf of Mexico. He testified that the safest method is to have certified riggers on board the vessel so that a transfer of personnel to the vessel is completely unnecessary. He considered the next safest method is the use of a personnel basket lowered onto the deck from a crane affixed to the platform. In his opinion, the use of a swing rope is categorically unsafe and is rendered even more unsafe in 6 to 8 foot seas. He faults Chevron because the gauger allegedly ordered the plaintiff to unload the boat and for not having a personnel basket to lower the plaintiff onto the Christopher. He faults Gulf Crews because the boat captain did not insist that the plaintiff not board under the prevailing conditions.

Mr. Singletary had been retained about two months prior to the trial of this case in June, 1991. On cross-examination, it was established that he predicated his opinion on the basis that the seas were 5 feet high, which he claimed to have gleaned from a copy of the plaintiff's deposition. He reiterated that he felt that a swing rope was dangerous *per se*. He further stated that the companies for whom and with whom he had worked had utilized swing ropes, but simply said that did not make it safe.

Mr. Sheldon Held testified as an expert on behalf of defendants. He is president of Rivers and Gulf Marine Surveyors. He attended the New York State Merchant Marine Academy and went into the Army in 1946 at the age of eighteen. He sailed Army vessels, performed marine salvage, etc. while in the Army, and retired as a Major in 1967. His company performs the full gamut of marine consulting. There are eight employees. He has been working in the Gulf of Mexico for some 24 years. He was employed in connection with this case in December of 1990. According to

Mr. Held, who was likewise recognized by the court as an expert in the field of marine safety, swing ropes are the primary method of getting from platforms to boats and from boats to platforms. He testified that they are safe, usual, and preferred by many people. He disputed Mr. Singletary's claim that a personnel basket is the safest way to get back and forth. It operates from a height about 85 feet above the deck of the vessel. People riding are suspended in air for some time either ascending or descending. The crane operator has to judge from high above the vessel how to maneuver the personnel basket to land it safely on the deck below. He testified that based on the prevailing circumstances, with seas 4 feet to 8 feet in height, as a boat captain he would not have a problem with Mr. Lavergne boarding by using a swing rope. He saw no reason under the circumstances to cause the captain of the Christopher to refuse to let the plaintiff make the transfer. He did say that if the seas were as high as 10 feet, he would not have felt it would be safe to board using either a swing rope or a personnel basket. Both Captains Hardy and Wilson testified that 5 to 8 foot seas are common during the winter months in the Gulf of Mexico and that they use swing ropes routinely during this time and in seas of that description. Captain Wilson further testified that in the field where this accident occurred, about 50 percent of the rigs use swing ropes and 50 percent use personnel baskets. Captain Wilson also testified that he has worked in many fields where there are only swing ropes on all the platforms.

Pertinent to the issue of Chevron's claim against M/V Christopher, Inc. for recovery of costs of defense, there was a time charter agreement between Chevron and M/V Christopher, Inc. which provided in pertinent part as follows:

"Owner hereby agrees to defend, indemnify and hold harmless Chevron against all claims for taxes or for penalties or fines, as well as against any and all other claims for damages, whether to person or property, and howsoever arising in anyway directly or indirectly connected with the possession, navigation, manage-
ment and operation of the vessel. However, Chevron shall have the right, at its option, to participate in the defense of any suit without relieving owner of any obligation hereunder.

"During the life of this charter, owner will, at its own expense, provide and maintain insurance covering all liabilities which might arise from the possession, management, manning, navigation and operation of the vessel, which said policy shall be in form and amount, and with companies as required and approved by Chevron."

A copy of the P & I policy issued to Gulf Crews, Inc. and M/V Christopher, Inc. by Lloyds and Institute Companies, with an endorsement naming Chevron U.S.A. as an additional insured, was introduced to evidence as Joint Exhibit 2.

### Analysis of Law and Facts

Based upon the evidence as summarized above, the undersigned finds that the height of the seas varied between 4 feet and 8 feet, the preponderance of the evidence clearly establishing those perimeters. Mr. Lavergne is the only witness mentioning seas 8 to 10 feet high, and his testimony is far outweighed by the other credible testimony. Counsel for plaintiff, in pretrial memorandum, states that "to order a man to board a vessel by 'Tarzan-rope' in seas of 8 feet is clear negligence." As authority, counsel cites *Smith v. Chevron Oil Co.*, 517 F.2d 1154 (5th Cir.1975), and *Moore v. Phillips Petroleum, et al.*, 698 F.Supp. 105 (E.D.La.1983). Counsel's reliance on both the cited cases is entirely misplaced. In *Smith*, the plaintiff was injured because the swing rope which he was utilizing was covered with oil from a fire and blowout that had occurred at the Chevron rig about a month before his accident. No mention whatever was made of the height of the seas in the opinion. In *Moore*, the plaintiff was injured because the swing rope broke as he attempted to transfer from the vessel to the platform. Again, the condition of the seas was not mentioned.

The testimony of Mr. Singletary notwithstanding, this court finds that the use of a

swing rope is an accepted and frequently used method of transferring personnel from boats to platforms in the Gulf of Mexico, has been for many years, and is at the present time. Such use of swing ropes was recognized by the expert witness who testified in the case of *Counts v. Lafayette Crewboats, Inc.*, 622 F.Supp. 299 (1983), in which case the author of the opinion mentioned that personnel baskets offer their own hazards. In that case, it is interesting to note that although the waves were running 6 to 8 feet, "no particular hazard existed." The plaintiff in the case elected not to even utilize the swing rope in attempting to step off the platform onto the deck of the crew boat, and he fell when the boat dipped down in response to a wave.

As regards the liability of the vessel owner, the law is that a passenger may only recover personal injury damages if he proves fault and negligence of the carrier. In other words, the burden of proof is on plaintiff to prove negligence of the carrier. A vessel owner must provide a passenger a reasonably safe means of boarding a vessel, including the provision of proper gangways, landing places, and personnel assistance. The passenger must also exercise reasonable care and prudence, and since the vessel owner is not an absolute insurer of the passenger's safety, if the passenger is injured absent vessel owner negligence, no recovery is mandated. See *Counts, supra.* Applying this law to the facts in this case, we had 4 to 8 foot seas, which, as indicated in *Counts,* presented no particular hazard. There was an open grating landing area at the stern of the vessel which was not criticized by either of the experts as being inadequate. A deckhand caught the defendant as he landed. Interestingly, Mr. Corbello observed that it would be virtually impossible for Mr. Lavergne to have slammed into the rail as he testified unless he had landed on the metal platform at the rear of the boat on his knees. Mr. Lavergne is 6′3″ tall, and the rail was only about 3 feet tall. According to Mr. Lavergne, he dropped some 3 feet to the deck after his alleged collision with the rail which he claims broke his finger. It is the court's feeling that it would have been virtually impossible for the accident to have occurred as described by Mr. Lavergne, and all circumstances considered, it is more likely that somehow Mr. Lavergne injured his finger from the way he grasped the rope, perhaps at one of the knots, and the way his weight shifted on the rope as he swung.

The court further finds that the vessel captains maneuvered the boat to a position well within safe boarding distance using the swing rope, a distance of 3 to 5 feet. Additionally, the court finds that the vessel captains, who permitted Mr. Lavergne to board the vessel, were reasonable in taking into consideration Mr. Lavergne's size, apparent strength, and demonstrated ability over a number of months in using this same swing rope in boarding this identical vessel. In summary, the court simply finds no negligence whatsoever on the part of Gulf Crews, Inc. or M/V Christopher, Inc.

The court will next consider the issue of liability on the part of Chevron U.S.A., Inc. Chevron claims that plaintiff was its borrowed servant under the facts of this case. Plaintiff claims that the issue of borrowed status was not properly raised by the pleadings and denies such a relationship. In what is labelled its Sixth Defense, Chevron alleged that plaintiff's remedy was limited to workmen's compensation benefits, which speaks directly to the borrowed servant status issue. Further, Rule 15(b) of the Federal Rules of Civil Procedure provides in pertinent part as follow:

> "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues * * *."

Evidence which was plainly directed to this issue was not objected to plaintiff's attorney, so even if the pleadings were

deficient (which contention the court rejects), the issue would be presented to the court on the basis of implied expansion of the pleadings through the evidence.

■ It is difficult to imagine a clearer case of borrowed servant status. Mr. Lavergne was a select employee. There had been several Crown employees at this Chevron rig, but when layoffs occurred during the oil recession, all but Mr. Lavergne were terminated on this platform. As stated in the summary of the evidence above, Mr. Lavergne himself testified that he had worked this Chevron platform for approximately three years before the accident. He was the only Crown employee there, and the Chevron employees told him when, where, and how to perform his work. They exercised complete control over him. He worked at satellite rigs of Chevron when he was told to do so. By his own testimony, he was afraid he would lose his job if he did not satisfy *Chevron's* expectations. Not only is the evidence clear that Chevron had the right of control of Mr. Lavergne, but Chevron exercised full control over him and had done so for some three years. Virtually his only connection with Crown, the direct employer, was that he had been hired by Crown and he received his pay check from Crown. He had aspirations of becoming a direct Chevron employee because of his good work for his Chevron supervisors. Applying the criteria of *Ruiz v. Shell Oil Company*, 413 F.2d 310 (5th Cir.1969), *Gaudet v. Exxon Corp.*, 562 F.2d 351 (5th Cir.1967), *Melancon v. Amoco Production Co.*, 834 F.2d 1238 (5th Cir.1988), and *Hebron v. Union Oil Co.*, 634 F.2d 245 (5th Cir.1981), without enumerating all of the factors, the court finds that Mr. Lavergne was indeed a borrowed servant of Chevron U.S.A., Inc. and as such he would have no right in tort against Chevron.

■ On the issue of negligence, and assuming that Mr. Lavergne was not a borrowed servant of Chevron, the court finds no negligence at all ascribable to Chevron causally related to this mishap. Mr. Lavergne himself testified that he was well-liked and respected for his ability by all of the Chevron people. This was corroborated by Ms. Bourgeois and the two boat captains who had observed his work. Mr. Lavergne testified that he had boarded vessels many times using a swing rope and did not need to have anyone tell him how to do it. Ms. Bourgeois herself, a 5′2″ tall lady, had boarded a vessel using a swing rope on at least one occasion in 8 foot seas. The discussion regarding the suitability of swing ropes and the status of the seas as a factor in relation to the alleged negligence of Gulf Crews, Inc. and MV/Christopher, Inc. is equally applicable here. Even assuming seas had been as high as 8 feet, Chevron would not have been at fault for not making that observation and restraining the plaintiff from attempting to board the Christopher. Plaintiff's own expert witness, Mr. Singletary, listened to the entire testimony before he himself testified, and he stated that he had heard nothing which to him would indicate any coercion whatsoever on the part of Chevron to make Mr. Lavergne swing over to board the Christopher against his will. Plaintiff never testified that he did not feel he was capable of making the transfer, and certainly he never communicated anything like that to Chevron personnel with whom he was on exceedingly good terms.

■ Chevron seeks indemnity for costs of defense against the codefendants as well as the vessel Christopher. The provisions of the indemnifying clause in the charter contract between M/V Christopher, Inc. and Chevron are quoted above. Nothing in the language of the indemnifying clause purports to indemnify Chevron against its own negligence. Independent negligence of Chevron is alleged by the plaintiff, and Chevron had an obvious interest in defending against those claims. Counsel for Chevron cites the case of *Clement v. Marathon Oil Co. and Co–Mar Corp.*, 724 F.Supp. 431 (E.D.1989), as authority for its position that it should be indemnified. The court therein held that Marathon was owed indemnity and a defense under the P & I policy covering the vessel in view of specific language in the charter agreement. That specific language held the vessel own-

er responsible to indemnify Marathon "from and against any and all claims for damages, whether to personal property, and against all loss, liability, and expense, including attorneys' fees, howsoever arising, whether or not based in whole or in part on any negligent acts or omissions of Marathon, sole or concurrent, or whether or not based in whole or in part on fault … of unseaworthiness of Marathon, sole or concurrent, in any way directly or indirectly connected with the possession, navigation, management, and operation of the vessel, or the related activities of Marathon in the vicinity thereof, including, but not limited to loading or unloading."

The plaintiff, Clement, was employed as a deckhand on the vessel, and he was injured when he was struck by an empty personnel basket being lowered by a Marathon operator from the Marathon platform. The judge in that case distinguished the cases relied upon by counsel for Gulf Crews, Inc. and M/V Christopher, Inc., *i.e.*, *Smith v. Tenneco Oil Co.*, 803 F.2d 1386 (5th Cir.1986), and *Hobbs v. Teledyne Movible Offshore, Inc.*, 632 F.2d 1238 (5th Cir. 1980). The court found that the indemnity language specifically referred to "loading and unloading" and, of course, language in the charter clearly made the vessel owner responsible for negligence on the part of Marathon's employees. Neither distinction applies here. There is no reference to Chevron being indemnified against its own fault in the charter agreement, nor does indemnification extend to loading and unloading operations. The court finds the *Smith* and *Hobbs* cases relied upon by counsel for Gulf Crews, Inc., M/V Christopher, Inc. and the vessel Christopher to be controlling and rejects Chevron's claim for defense costs via its third party complaint.

Pursuant to the foregoing discussion, the court makes the following findings of fact and conclusions of law in connection with this case.

### Findings of Fact

(1) Plaintiff, Randal J. Lavergne, on November 18, 1987, was a direct roustabout employee of Crown Oilfield Services, Inc. Crown was under contract with Chevron U.S.A., Inc. to supply roustabout services to Chevron's fixed platform identified as Vermilion 287 about 100 miles offshore in the Gulf of Mexico. Plaintiff was assigned to that platform, and had worked there for approximately three years prior to November 18, 1987.

(2) Plaintiff was the only Crown employee assigned to the Chevron rig in question. He was under the direct supervision of Chevron employees, who directed him when, where, and how to perform the services that Chevron required of him, and at times he worked on Chevron's satellite rigs.

(3) On November 18, 1987, at approximately 4:00 P.M., the M/V Christopher, a large utility boat owned by M/V Christopher, Inc. and operated by a crew employed by Gulf Crews, Inc., arrived at Vermilion 287 for the purpose of off-loading groceries and other supplies.

(4) One of plaintiff's routine duties since he had been assigned to this rig was to board the supply boat by use of a swing rope affixed to the platform and hook the container of supplies on the vessel to a cable attached to a crane located on the platform some 85 feet above.

(5) When Mr. Lavergne arrived at the 10 + platform, which was the higher of two platforms used to board and disembark from vessels by platform personnel, seas were running between 5 feet and 8 feet high.

(6) The MV/Christopher maneuvered to a position between 3 feet and 5 feet from the platform on which plaintiff was standing, stern foremost. The boat had, across the stern, a landing area 3½ to 4 feet wide and constructed of open metal grating for use by people boarding the boat from platforms using swing ropes.

(7) The plaintiff grasped the swing rope, which was of proper strength and dimensions, and had knots tied in it at 12 to 18 inch intervals, and attempted to time his swing onto the vessel with the action of the waves.

(8) The plaintiff was a large man, some 6'3″ tall and weighing between 200 and 210 pounds, possessing considerable strength and agility which he had demonstrated both to Chevron personnel and members of the vessel crew on many occasions before this date.

(9) Before attempting to swing over to the vessel, a deckhand, Mervin Lee Corbello, Jr., had positioned himself on the landing area of the boat to catch the plaintiff when he arrived. The use of a swing rope, and the manner in which it was utilized in attempting this boarding, was usual and customary under the circumstances and presented no hazards which would have required either the vessel crew or Chevron personnel to dissuade plaintiff from boarding the vessel. The plaintiff, an experienced roustabout, who had accomplished this maneuver many times in the past, required no special instructions before attempting to board the vessel.

(10) Without having to run or even push off from the platform, the plaintiff swung over to the vessel and somehow, in the course of his swing, caused his left middle finger to be twisted, dislocated, and fractured at the distal phalanx. Notwithstanding this, plaintiff was caught by the deckhand and, except for the injured finger, landed safely on the boat.

(11) Plaintiff was taken with due dispatch back to land, and unfortunately had complications with the healing of his finger that required him to undergo some seven surgical procedures before achieving maximum recovery. Even after this, he has been left with residual stiffness and some deformity in the left middle finger.

(12) At the time of the aforesaid accident, a protection and indemnity policy was in force naming Gulf Crews, Inc. and M/V Christopher, Inc. as insureds and containing an endorsement naming Chevron U.S.A. as an additional insured. Also, there was a time charter agreement between Chevron and M/V Christopher, Inc. which required Christopher to indemnify Chevron for damages to person or property "connected with the possession, navigation, management and operation of the vessel."

The agreement did not specify that Christopher would indemnify Chevron against its (Chevron's) own fault, nor did it state it extended to loading and unloading operations.

### Conclusions of Law

(1) The court cannot presume negligence or fault on the part of any of the defendants in this case, but the plaintiff bears the burden of proving negligence by a preponderance of the evidence.

(2) The plaintiff failed to bear his burden of establishing negligence on the part of any of the defendants named in this case.

(3) Even if negligence against Chevron U.S.A., Inc. had been established, that defendant is immune from liability in tort to Randal J. Lavergne because Mr. Lavergne was, at the time of the accident, the borrowed servant of Chevron U.S.A., Inc.

(4) Chevron, as third party complainant, is not entitled to indemnification for defense costs against either Gulf Crews, Inc. or M/V Christopher, Inc. because the indemnifying agreement did not require indemnification for Chevron's own fault and because the injury to the plaintiff did not arise directly or indirectly from the possession, navigation, management, or operation of the vessel, as the vessel was simply waiting with cargo as the plaintiff attempted to board it.

(5) Plaintiff will be cast for all costs connected with the main demand herein, and Chevron U.S.A., Inc. will be cast for all costs connected with the third party complaint.

The court will render judgment in accordance with the above findings of fact and conclusions of law.